

FILED

MAR 2 0 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

KEYANNA BETHEA, ADMINISTRATOR
OF THE ESTATE OF DEANDRE BETHEA,
DECEASED, AND LEROY CLYBURN, III
AND NAHHIME SAWYER,

      **Plaintiffs,**

**v.**                                                      **Civil No. 4:19cv49**

OFFICER CHARLES HOWSER AND
OFFICER MAURICE CRAIGHILL,

      **Defendants.**

## OPINION & ORDER

These matters are before the Court on Officer Maurice Craighill's ("Craighill") Motion for Summary Judgment, Doc. 26, and Officer Charles Howser's ("Howser") Motion for Summary Judgment, Doc. 28. For the following reasons herein, Craighill and Howser's Motions are **GRANTED.**

## I. FACTUAL BACKGROUND

### A. Detective Craighill and Sergeant Howser.

1. Craighill is a Detective with the Williamsburg Police Department and served in that capacity on October 17, 2017. Craighill Decl. at ¶ 2.

2. Howser is a Sergeant with the Newport News Police Department and served in that capacity on October 17, 2017. Howser Decl. at ¶ 2.

## B. Craighill's Knowledge of Suspected Crime in Newport News, Hampton, and Williamsburg.

3. During the two weeks before October 17, 2017, Craighill was aware of a crime spree in the Williamsburg, Newport News, and Hampton, Virginia area that included multiple vehicle and firearm thefts involving various criminal street gang members from across those areas. These same gang members had been suspects in murders, shootings, and other narcotic offenses. Craighill Decl. at ¶ 3.

4. Craighill was aware of the following incidents in the Williamsburg, Newport News, and Hampton area that had occurred: (1) one instance in which an individual was shot when they observed suspects going through cars; (2) another instance where a citizen reported being shot at by suspects going through cars; (3) a third incident in which officers reported hearing shots fired as they responded to a report of suspects going through cars; and (4) an abduction, robbery, and shooting event connected to a stolen vehicle. Craighill Decl. at ¶ 3.

## C. Howser's Knowledge Suspected Crime in Newport News, Hampton, and Williamsburg.

5. On October 13, 2017, Howser was directed to assign two members of his unit to assist the Central Precinct Property Crimes Division with their investigation into an identified trend of escalating violent property crimes. In the email request for assistance, Sergeant B. Bartley described that there was an escalating trend of property crimes transitioning into life threatening violent crimes. At the time of the email, Howser was advised that there had been several incidents in Newport News, along with others in surrounding jurisdictions, in which suspects stealing vehicles had fired shots. Some of the shots had gone into the air and some of the shots had been fired at victims. Howser Decl. at ¶ 6.

6. On October 17, 2017, Howser reported for duty at 4:00 P.M. and was scheduled to work until 12:00 A.M. After attending a supervisor's meeting, Howser met with on duty personnel

2

assigned to him. During this meeting, the team was briefed by Detective Beggs on information she had received regarding a shooting between members of local gangs. Detective Beggs stated that patrol officers had responded to a call of gun shots in a local Roses Discount Stores ("Roses") parking lot which led to the subsequent arrest of a suspect. According to Detective Beggs' briefing, there had been an exchange of gunfire and gang members had driven away in a red Buick SUV. As part of that briefing, Detective O'Mara had provided Detective Beggs with a vehicle registration for a stolen red Buick SUV suspected to have been the vehicle involved in the incident. At least one attempt to stop the vehicle had been made, but the vehicle fled. Howser Decl. at ¶ 7.

## D. Craighill's Investigation of a Stolen Buick.

7. On the morning of October 17, 2017, Craighill was assigned a case involving a red 2013 Buick Encore ("Buick") that had been stolen. Craighill Decl. at ¶ 4.

8. On the afternoon of October 17, 2017, Craighill learned that the Buick had been involved in a pursuit with Hampton Police Department officers that were responding to a robbery. Craighill obtained surveillance video from a Walmart store showing the individuals who were suspected to have stolen the Buick. The suspects were identified as two males who were affiliated with a known Newport News/Hampton gang. Craighill also learned that the Newport News Police Department had been investigating a drive-by shooting incident that also occurred on October 17, 2017 that involved a vehicle that matched the description of the stolen Buick. Further, Craighill was aware of one more sighting of the stolen Buick by a Newport News Police Department Traffic Unit on motorcycle on October 17, 2017, and in that instance the Buick had also fled and escaped from police. Craighill Decl. at ¶ 5.

9. Later on the evening of October 17, 2017, Craighill learned from the Hampton Police Department that the Newport News Police had found the unoccupied Buick, and Craighill was

3

instructed to meet with Sgt. Charles Howser of the Newport News Police Department. Craighill met Howser, who instructed Craighill to bring his bullet proof vest. Craighill put on his bullet proof vest with his badge hanging over the top so that it would be clearly visible to anyone who saw him. This is confirmed by Sergeant Smithley's Bodycam footage that shows Craighill's badge plainly displayed over his bulletproof vest.. Craighill Decl. at ¶ 6; see Bodycam Video, Smithley Decl. Ex. 1 at 01:47 – 01:52.

## E. Howser's Investigation of the Stolen Buick.

10. After the briefing and after completing his other administrative duties, Howser received a message from Detective Beggs who was then in the field. Detective Beggs advised that she and Detective Gault were on their way to a red stolen SUV located at a local housing project referred to as the "Towers." Howser received confirmation from another officer that he was on the way. At that point, Howser gathered his equipment and began to drive toward the South Precinct from the Organized Crime Division Office. Howser made contact with Detective Gault, Detective Beggs, and Officer Marshall. The information provided to him was that the vehicle currently located at the Towers was a red Buick SUV stolen from Williamsburg. It was suspected to have been occupied by gang members, including Leroy Clyburn, who had been involved in the exchange of gunfire at the Roses earlier that day. Howser was also informed that the vehicle had been involved in a robbery in the City of Hampton resulting in a vehicle pursuit, but the offenders were not apprehended. Howser Decl. at ¶ 8.

11. Based upon the briefings and information Howser received, a reasonable suspicion formed in his mind that the occupants of the red Buick were involved in these incidents. Wishing to investigate further and confirm information, Howser made contact with Detective Beggs and instructed her to contact patrol officers involved in the shooting at the Roses earlier in the day.

4

Howser also asked that Detective Beggs further investigate how the Hampton Police knew that the vehicle under surveillance was the one involved in the incidents in Hampton. Howser Decl. at ¶ 9.

12. In response, Detective Beggs also informed Howser that Williamsburg detectives had been notified of the vehicle location and an officer from Williamsburg was en route to assist with surveillance. Howser asked Detective Beggs to have the Williamsburg detective meet him at a nearby location in order to go over to the Towers together. It was his plan to ensure that a plain clothes officer from another jurisdiction was not mistakenly identified as a threat. Howser Decl. at ¶ 10.

13. As a supervisor in the Violent Crime Reduction Task Force, Howser was aware and had received extensive information regarding the suspected activities of the gangs involved in these property crimes, the Walker Vill and OTC gangs. The intelligence had come from documented reliable sources, undocumented sources, detectives, patrol officers, and witnesses from multiple jurisdictions. The intelligence summarized that various members of these gangs were involved in vehicle thefts, burglary, and tampering with vehicle offenses throughout the Peninsula and Southside for roughly a year. Members of these gangs were operating in groups, driving stolen vehicles, and were armed. The trend had been, as noted above, that the groups had become more violent and were implicated in robberies, discharging weapons, and aggravated assaults. Howser Decl. at ¶ 11.

14. Howser consulted with his chain of command regarding the use of "stop sticks" (a device employed to limit mobility of a vehicle) and to coordinate a plan of action. Detective Gault and Detective Beggs, having already established visual surveillance on the suspect vehicle, were designated as the "eye/trigger" for the operation. From that position, Detective Beggs and Detective Gault would be able to see the target being surveilled and order others, including a

5

takedown team, to move in. Detective Davidson and Detective Woods would be positioned concealed in the parking lot and would be the first take down unit responsible for moving to arrest the offenders once they began to enter the stolen vehicle. Officer Ralph and Officer Haywood would respond as the second take down team providing a uniform patrol presence along with MPO Shelton for K-9 support. Should the vehicle go mobile and attempt to flee, Officer Marshall was positioned at the entrance of the complex with spike strips to disable the vehicle's tires. The trooper would engage in pursuit of the vehicle with Newport News police personnel providing support blocking intersections and perimeter should the occupants flee on foot. Howser Decl. at ¶ 13.

15. After formulating the plan, Howser met Detective Lang Craighill at 12th Street and Jefferson Avenue in the City of Newport News. Howser is familiar with Craighill, and Howser was confident that Craighill was familiar with the nature of the investigations and the identities of Newport News Police personnel. Howser invited him to ride as a passenger in his vehicle. Howser Decl. at ¶ 13.

**F. Surveillance of the Stolen Buick and Suspects Identified in a Stolen Ford Raptor.**

16. Howser drove Craighill to the Towers, which is an apartment complex located at 700 Water Front Circle in Newport News. Once there, Craighill observed the Buick parked in the back of the parking lot away from other vehicles. The plan was to wait for the suspects to return to the Buick and arrest them by utilizing a takedown team and additional backup units. Craighill Decl. at ¶ 7.

17. While observing the Buick, Howser and Craighill discussed the Hampton robbery, the vehicle pursuit, and the shooting in Newport News involving the suspects associated with the stolen Buick earlier that day. Howser and Craighill also discussed their knowledge of the gangs

believed to have been involved, the suspects, their very violent behavior, and their tendency to attempt to evade officers and shoot. Craighill Decl. at ¶ 7.

18. At approximately 11:00 p.m. on October 17, 2017, Craighill and Howser took a break from conducting surveillance. While on their break, Craighill learned that other Newport News Police Department officers conducting surveillance at the Towers observed a black Ford F-150 Raptor ("Raptor") pickup truck parked near the stolen Buick. Both Craighill and Howser were immediately suspicious of the Raptor, given that such an expensive vehicle is rare in the area of Newport News where the Towers is located. Craighill suspected that whoever was riding in the Raptor had come back for the Buick since it could have parked anywhere in the parking lot but instead chose to park near the Buick. Craighill Decl. at ¶ 7; Howser Decl. at ¶ 18.

19. Howser then informed Craighill that the surveillance unit had run the Raptor's license plates, which were from Georgia. The Raptor had been reported stolen. At that point, Craighill suspected that the occupants of the Raptor had been involved with stealing the Buick and that they were likely part of the gangs who had been stealing vehicles and firearms in Newport News, Hampton, and Williamsburg. Craighill was concerned the occupants of the Raptor were armed with guns and dangerous. Howser was also concerned that this new stolen vehicle was one that was being involved in the recent trend of property crimes and violent crimes. Howser instructed Detective Gault and Detective Beggs to maintain visual surveillance on the Raptor and to switch their radio traffic to a different frequency. He instructed Detective Gault and Detective Beggs only to tail the vehicle but not to attempt to conduct a traffic stop. Howser Decl. at ¶ 18; Craighill Decl. at ¶ 9.

**G. Pursuit of the Stolen Ford F-150 Raptor.**

20. Craighill and Howser left the nearby 7-Eleven quickly and responded to assist with the surveillance of the Raptor which, by this point, had become mobile. Howser asked for additional vehicles to be provided to the effort, including marked vehicles from the State Police and Hampton Police. Craighill and Howser, in coordination with surveillance units who had been at the Towers, drove to try and locate the Raptor. Howser Decl. at ¶ 20. Craighill Decl. at ¶ 10

21. Craighill and Howser heard a police unit report over the radio that they spotted the Raptor parked near the pumps at a 7-Eleven located at the intersection of Cherry Ave. and Kecoughtan Rd. in Hampton, Virginia. When Craighill and Howser arrived at the 7-Eleven, Craighill saw the black Ford Raptor pickup truck parked with its lights on and backed up near the front door of the 7-Eleven. The Raptor was parked in reverse such that the rear of the truck was closest to the front door of the 7-Eleven, and the front of the truck was facing out towards the parking lot with its headlights on. Craighill Decl. at ¶ 10; Howser Decl. at ¶ 21; see Craighill Decl. at ¶ 13(a); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:01.

22. Based on the totality of the investigation, as well as the likelihood of the offender fleeing, an arrest was to be effected, Howser determined that the best time to attempt an arrest of the offender would be when there was no driver in the vehicle. Further, he observed no uninvolved citizens in the parking lot of the 7-Eleven, and it appeared that the business was not busy. The video evidence does show that there were multiple vehicles in the parking lot and people entering the 7-Eleven at the time of the incident. Pls. 7-Eleven Video 2, Doc. 35 Ex. 6 at 00:06. Howser determined all of this after he had arrived at the 7-Eleven at Cherry Ave. and Kecoughtan Rd. It was Howser's belief that the best time to act and that the best opportunity to act was to apprehend the offender while limiting risk to the public. Howser Decl. at ¶ 23.

8

23. Howser communicated with his team that he was going to "take down" the Raptor right there in the parking lot. Craighill Decl. at ¶ 10; Howser Decl. at ¶ 24.

**H. First Encounter with Occupants of the Ford F-150 Raptor as Confirmed by Surveillance Video.**

24. At this time, Howser did not observe anyone occupying the driver's seat of the vehicle. Howser did not know if the vehicle contained other occupants, so Howser pulled his unmarked police Jeep Cherokee in front of the parked Raptor. Howser had the police lights and siren activated on his Jeep and stopped close to the front of the Raptor as if Howser was trying to pin it in. Surveillance video from the 7-Eleven confirms the Jeep's police lights were on.[1] In addition, Sergeant Steven Smithley of the Newport News Police Department was positioned four houses behind the 7-Eleven and heard audible police sirens. Howser Decl. at ¶ 24; See Craighill Decl. at ¶ 12; Smithley Decl. at ¶¶5, 7; Defs. 7-Eleven Video, Doc. 27-3.

25. Before Craighill and Howser arrived, Darone Owens, the driver of the Raptor had entered the 7-Eleven. Jontazz Robinson was in the front passenger seat of the Raptor. Deandra Bethea was in the rear passenger seat behind the driver's seat. Nahhime Sawyer was in the middle rear passenger seat. Leroy Clyburn was in the rear passenger seat behind the front passenger seat. See Sawyer Dep. 58:7 –59:22; 63:8-21; Clyburn Dep. 79:5 –80:1.

26. Immediately as Howser flipped the lights and sirens on his vehicle, the passenger door of the Raptor opened and a black male wearing a dark coat exited. Howser quickly exited his vehicle and was unable to shut off the vehicle's siren. Craighill exited the Jeep driven by Howser with his badge displayed and his 320 Sig pistol in his hand and aimed at the driver's side of the

---

[1] Plaintiffs dispute that the lights and sirens were on as the Howser and Craighill exited the jeep. They aver that the lights only came on after the Raptor began to move forward. They cite to Winder's witness testimony and the Parking Lot video to prove this assertion. The surveillance video from inside the 7-Eleven shows the lights coming on before the Raptor began to move. See Defs. 7-Eleven Video, Doc. 27-3 at 00:42.

Raptor. The male was concealing himself behind the open passenger door as he backed up toward the store/rear of the truck. Howser moved away from his vehicle to get a better visual on that individual. Once Howser positioned himself far enough out to the left, he could clearly see the individual's outline. Howser could not clearly see the subject's face or hands as the store lights were back lighting him. The subject's arms were not down by his sides but were more in front of his body based upon the outline that was visible. At this moment, Howser felt a threat of serious bodily harm or injury or death to himself or others in the area, Howser drew his service weapon and yelled at the individual, "let me see your hands." As Craighill approached, his pistol was equipped with a flashlight that was on, as can be seen in 7-Eleven surveillance video, which also shows that Craighill was standing in front of the Raptor. At the same moment that Craighill can first be seen in the video standing in front of the Raptor, Craighill attests that he yelled, "Police, don't move!" as loud as he could as he was watching the driver's side of the Raptor. Howser Decl ¶¶ at 25-26; see Craighill Decl. at ¶¶ 13(b), (c); see also Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:06 – 00:07. Plaintiffs claim that Craighill nor Howser ever identified themselves as law enforcement. Sawyer Dep. at 68.

27. The individual from the passenger seat of the truck moved to the rear of the Raptor, turned right and began to flee on foot near the rear of the vehicle. As the subject turned to flee, Howser observed an item in his right hand that appeared to be a semi-automatic handgun. Howser was only able to see the outline of the gun as the individual was back lit by the light of the parking lot. Howser Decl. ¶ 27; see Craighill Decl. at ¶ 13(b); see also Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:06. Plaintiffs claim that the video shows that the passenger, Robinson, never attempted to raise a weapon and was just running away from Howser and Craighill. Pls. 7-Eleven Video 2, Doc. 35 Ex. 8 at 00:04.

28. From Craighill's perspective, he believed the Raptor's engine was running at this point, which raised a concern for Craighill that the Raptor may flee the scene or run over him. Further, based on the recent history of gang-related stolen vehicles and firearms in the area and the suspected connection between the Raptor's occupants and the suspected gang members who had been seen with the stolen Buick and been involved in a shooting and police chase earlier that day, Craighill was concerned for his safety and the safety of Howser and other officers who were responding to the 7-Eleven. See Craighill Decl. at ¶ 13(b); see also Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:06.

29. Within one second or less, Craighill saw the silhouetted shape of someone in the driver's seat suddenly hunch forward. See Craighill Decl. at ¶ 13(d); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:07 – 00:08. Bethea had moved from the back seat to the driver's seat. See Sawyer Dep. 64:15 – 65:8. At the same time, Craighill heard the Raptor's engine race and the tires of the Raptor suddenly start to spin very fast as Bethea accelerated the Raptor and turned its tires in Craighill's direction, causing the Raptor to move toward Craighill. See Craighill Decl. at ¶ 13(d); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:07 – 00:08. The video confirms what Craighill perceived. At the 00:07 timestamp, the brake lights brighten, which indicates the Raptor is being placed in to the drive gear. At the 00:07 – 00:08 timestamp, the Raptor can be seen bolting forward and towards Craighill. Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:07 – 00:08.

30. Howser began hearing gunshots as the vehicle continued to move forward. The gunshots came after the engine of the truck was put into gear and moved. At this point, Howser believed that he and Craighill were being fired upon by the occupants of the vehicle. Although evidence later confirms that no shots were coming from the vehicle and the only bullets fired were from Craighill and Howser. Certificate of Analysis, Doc. 35-14. Howser quickly moved

backwards, left and away from his police vehicle as it was pushed approximately 10 to 15 feet from its originally parked location. Howser Decl. ¶¶ at 28-29; see Winder Decl. Plaintiffs attest that the Jeep was not pushed 10 to 15 feet and that the Jeep only sustained a minor 6-inch dent to the front of the bumper. See Scene Photos-Jeep, Doc. 35-6. During the events, Howser was unable to see Craighill and was only able to see the top of the Raptor as it drove toward the pumps. Howser Decl. ¶¶ at 28 - 30; see Winder Decl.

31. Craighill saw the muzzle of a pistol in the driver's side front window pointed directly at him while the Raptor was quickly driving towards him. At that moment, Craighill feared for his life. Craighill was concerned that either the Raptor would run him over or that he would be shot and killed. See Craighill Decl. at ¶ 13(e); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:08 – 00:09. Craighill claims he saw the gun barrel pointed at him from the driver's side window. The only gun recovered from the front seat of the vehicle was pink in color with a shiny gray metal slide. Craighill Interview, Doc. 35-2 at 3:48, Scene Photos-Raptor Interior, Doc. 35-10. There was none of Bethea's DNA found on the front seat firearm. Certificate of Analysis, Doc. 35-15.

32. Simultaneously, Craighill moved to his right and began firing into the driver's side window at the gun that was pointed in his direction. Craighill does not recall how many shots he fired, but they were all fired within approximately one second and in rapid succession until the Raptor passed Craighill. At that point, no shots were fired after the Raptor passed Craighill. Specifically, Craighill fired the shots at the 00:09 timestamp of the video as he moved out of the way of the Raptor. Craighill did not fire any shots at the driver's window after the 00:09 timestamp. From the time Craighill exited the Jeep driven by Howser to the time that Craighill fired shots in the direction of the driver, no more than four seconds elapsed. See Craighill Decl. at ¶ 13(e); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:08 – 00:09.

33. During this time, Howser believed Craighill was exchanging gunfire with the occupants of the Raptor. As his vehicle stopped moving backward, Howser moved around the rear of his Jeep for cover. Howser then observed movement and what he believed to be a muzzle flash from the rear interior of the Ford Raptor. Howser took aim to the right of the location where he had observed the flash and fired multiple rounds with his department issued handgun. Howser Decl. at ¶ 32.

34. Sawyer states that Bethea was not trying to hit Craighill or Howser, he was attempting to escape what he rightfully perceived to be a deadly situation. Sawyer avers that Bethea was trying to get away from whoever was shooting but the gas pumps were in the way. Sawyer Dep. at 72. Sawyer attests that the Raptor was not speeding or accelerating in a quick manner. Sawyer Dep. at 73.

## I. Second Encounter with Occupants of the Ford F-150 Raptor as Confirmed by Surveillance Video.

35. After the shots were fired at the driver's window, surveillance video confirms that the Raptor continued past Craighill and then crashed into a pole near the 7-Eleven gas pumps. No shots were fired in that timeframe as Craighill continued to watch the Raptor with his gun aimed at it. See Craighill Decl. at ¶ 13(f); Howser Decl. at ¶ 32; Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:010 – 00:12.

36. As confirmed by surveillance video, Craighill moved laterally and backwards in relation to the Raptor as it crashed and pointed his pistol down, because Craighill believed the threat might have been over at that point. Craighill can be seen lowering his pistol at the 00:13 timestamp. See Craighill Decl. at ¶ 13(g); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:13.

37. As soon as Craighill lowered his pistol, he observed the rear driver's side passenger door open quickly. See Craighill Decl. at ¶ 13(h); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:14. This can be seen at the 00:14 timestamp. At this point, Craighill was immediately concerned

13

that passengers in the backseat of the Raptor posed a threat. So, Craighill held his pistol up again and pointed it at the rear driver's side passenger door. This can be seen at the 00:15 timestamp. Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:15.

38. The front driver's side door also opened, which can be seen at the 00:16 timestamp. See Craighill Decl. at ¶ 13(i); Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:16. At the same time, Craighill observed a flurry of aggressive and fast movement towards him from two individuals in the back seat and also from the driver's door. Craighill specifically saw an African American male wearing a light gray hoodie kneeling in the floorboard between the front and back seats of the Raptor. Craighill knows now that the male who was wearing the light gray hoodie was Nahhime Sawyer. Craighill also saw an African American male wearing a red jacket whom Craighill now knows is Leroy Clyburn moving fast and aggressively toward Craighill.

39. Sawyer and Clyburn both appeared to Craighill to be making aggressive moves toward him. See Craighill Decl. at ¶ 13(j). 7-Eleven video footage attached as Exhibit 2 to Craighill's Declaration shows the rear driver's side passenger door of the Raptor opening quickly at the 0:10 timestamp. See Craighill Decl. at ¶ 14; Defs. 7-Eleven Video, Craighill Decl. Ex. 2. Movement from occupants in the backseat of the Raptor can be seen through the rear driver's side passenger door at the 00:11 timestamp of the 7-Eleven surveillance video attached as Exhibit 2 to Craighill's Declaration. At that moment, Craighill perceived the occupants to be moving toward him aggressively. Sawyer himself admits that he was coming out of the truck after it crashed and the door opened. See Sawyer Dep. at 157:18 – 158:1. At this moment, Craighill saw Sawyer make eye contact with Craighill. Craighill attests that Sawyer had an aggressive look on his face. Sawyer then proceeded to raise a gun from his hip area pointing the gun directly at Craighill. See Craighill Decl. at ¶ 13(j); Sawyer Dep. 85:21 – 86:2.

14

40. At the point the gun was raised, Craighill again feared that he was going to be shot and killed. See Craighill Decl. at ¶ 13(j). Craighill moved backwards and fired in reaction to the threats emerging toward him and immediately fired his pistol in the direction of Sawyer. Craighill does not recall how many shots he fired, but they were all fired in approximately one second and in rapid succession. Craighill stopped firing as soon as he saw Sawyer fall backwards and perceived Sawyer to no longer be an immediate threat. Craighill did not fire his pistol after observing Sawyer fall backwards. In reference to the video attached as Exhibit 1 to Craighill's Declaration, Craighill fired his pistol at the 00:17 – 00:18 timestamp with all shots made within approximately one second. Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:17 – 00:18. Plaintiffs dispute the aggressive nature of the backseat occupants of the car. Sawyer states that he opened the door because they had hit the gas pump and he was afraid it might explode and that he was not going to sit in a car that was being fired on from all around. Sawyer Dep. at 78. Sawyer states that he was hit first in the chest, then he turned away from the gunfire and was shot 4 more times as well as grazed twice on his right side. Sawyer Dep. 80-83.

41. After Sawyer fell backwards, Craighill did not see anyone attempt to engage him again so Craighill began to shout commands to Sawyer and Clyburn, telling them to show Craighill their hands. They did not comply, but Craighill nonetheless began extracting Clyburn and Sawyer from the vehicle in order to render assistance. See Craighill Decl. at ¶ 13(k).

42. From the time the rear driver's side passenger door of the Raptor opened after the Raptor had crashed to the time that Craighill fired shots in the direction of the rear passenger seat of the Raptor, no more than four seconds elapsed. See Craighill Decl. at ¶ 13(l).

43. During these events, Howser moved forward holding coverage on the rear of the Raptor. Howser heard Craighill giving verbal commands. Howser was only able to hear part of

15

what he said. Howser believed he said something about a gun and hands. Howser looked left and observed Craighill in the parking lot with his weapon drawn pointed at the vehicle. Sergeant Smithley was approaching the vehicle from Cherry Avenue with his weapon drawn. As Howser faced the business again, he noticed an individual who he believed to be the initial driver of the vehicle crouching behind the smoked glass of the window of the 7-Eleven. This additional subject's hands were hidden, but it appeared that he may have been holding something in front of him based upon the positioning of his arms. Howser instructed Detective Gault to go secure the individual. Howser cautioned him that the subject may be holding a gun. Howser held coverage of the individual inside the store as Detective Gault entered the business and confronted the individual. Howser Decl. ¶ 33.

44. Plaintiffs dispute Defendants' claim that no shots were fired into the driver's side after the Raptor passed Craighill. Plaintiffs note that Bethea was shot 5 times and aver based on photographs of the Raptor's driver's side window, only 3 bullets went through the window. Defendants dispute this fact noting that there are in fact five bullet holes in the door. Plaintiffs cite Medical Examiner Elizabeth Kinnison, M.D. autopsy as proof that 2 of the gunshot wounds entered from Bethea's back. Bethea Autopsy, Doc. 35-12 at 2-3, 5.

**J. Recovered Guns Found in and Outside the Raptor.**

45. Sergeant Steven Smithley of the Newport News Police Department ran over to the Ford Raptor immediately after Craighill deployed his weapon the second time. See Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:31 – 00:36; Smithley Decl. at ¶¶ 8-9.

46. As Smithley approached Craighill, Smithley heard loud music coming from the Raptor and observed Craighill talking to Sawyer and Clyburn. See Smithley Decl. at ¶ 10.

47. Smithley observed Clyburn lying face down on the backseat of the Raptor with his head pointing out of the open door. Bodycam video attached as Exhibit 1 to Smithley Decl. Sawyer was

16

lying across the floorboard of the backseat with his legs closest to the open door. See Smithley Decl. at ¶¶ 10, 14.

48. Smithley turned on a flashlight attached to his firearm and observed Clyburn's left hand pointing forward and a handgun on the seat directly under Clyburn's left hand. See Smithley Decl. at ¶¶ 11, 15; Bodycam Video, Smithley Decl. Ex. 1 at 00:47; Smithley Decl. Ex. 2.

49. Craighill pulled Clyburn from the Raptor, and Smithley's bodycam shows the gun still on the backseat of the Raptor while Sawyer remained in the Raptor. See Smithley Decl. at ¶¶ 12, 16; Bodycam Video, Smithley Decl. Ex. 1 at 00:52 – 01:00, 01:16 – 01:26; Smithley Decl. Ex. 2-4.

50. Officer Corey Rodriguez of the Newport News Police Department also responded to the scene and could hear loud music coming from the Raptor as he approached it. See Rodriguez Decl. at ¶¶ 3-6, 9.

51. Rodriguez provided aid to Sawyer, who was lying on the ground under the rear passenger door on the driver's side of the Raptor. While Rodriguez was giving Sawyer aid, Rodriguez looked in the Raptor through the open rear driver's side door and saw multiple firearms. At least one firearm was on the back passenger seat behind the driver's seat. Rodriguez then closed the door to prevent the suspects from obtaining any firearms and to prevent any firearms from falling out of the vehicle. See Rodriguez Decl. at ¶¶ 8, 10-13; Bodycam Video, Rodriguez Decl. Ex. 1 at 07:33; Rodriguez Decl. Ex. 2.

52. Melissa Wright-Kelly, a forensic specialist with the Hampton Police Division assisted with the investigation of the shooting through photographs, documentation, and the collection of evidence found on the scene. See Wright-Kelly Decl. at ¶¶ 3-4.

17

53. Wright-Kelley found two handguns on the backseat of the Raptor, one of which had been under a black stocking cap. These two firearms were recovered from underneath Clyburn and were covered in his blood. See Wright-Kelly Decl. at ¶¶ 7-8; Wright-Kelly Decl. Ex. 3-4.

54. Wright-Kelley also found a pink handgun in the floorboard of the front passenger seat of the Raptor. See Wright-Kelly Decl. at ¶ 9; Wright-Kelly Decl. Ex. 5.

55. None of the three guns found in the Raptor tested positive for DNA from Sawyer or Bethea, and the only positive DNA match for Clyburn was taken from blood found on the two guns in the backseat, labeled Items 42 and 43. Clyburn's DNA was not found on the pink gun in the front passenger floorboard. See Certificate of Analysis, Doc. 35-15. Clyburn and Sawyer attest that they did not know the guns were in the Raptor, and they never saw Bethea with a firearm. Clyburn Dep. at 94, 98; Sawyer Dep. at 88.

**K. Damage to the Raptor and the Jeep.**

56. Wright-Kelly photographed the Raptor in its final resting spot where it had crashed into a pole near a gas pump. See Wright-Kelly Decl. at ¶ 5; Wright-Kelly Decl. Ex. 1.

57. Wright-Kelley found bullet holes in the front driver's door and driver's window of the Raptor. See Wright-Kelly Decl. at ¶ 10; Wright-Kelly Decl. Ex. 6.

58. There was no damage to the driver's side rear passenger door and window of the Raptor. Wright-Kelly did not find any bullet holes in the driver's side rear passenger door of the Raptor. Wright-Kelly also did not find any bullet holes in the rear passenger window on the driver's side of the Raptor. The only bullet holes were in the passenger's side rear window. See Wright-Kelly Decl. at ¶ 11; Wright-Kelly Decl. Ex. 7-8.

59. The Jeep driven by Howser sustained front end damage from the Raptor as a result of the Raptor moving the parking spot in front of the 7-Eleven. See Wright-Kelly Decl. at ¶ 6; Wright-Kelly Decl. Ex. 2.

## II. OFFICERS' MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Terry's Floor Fashions v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–24. Such facts must be presented in the form of exhibits and sworn affidavits. Failure to rebut the motion with such evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. See Anderson, 477 U.S. at 252. Therefore, the "Court must view the evidence in the light most favorable to the party opposing summary judgment . . . [and] draw[] all reasonable inferences" in the favor of that party. Brown v. Elliott, 876 F.3d 637, 642 (4th Cir. 2017). Despite

19

this mandate, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324). Within an excessive force claim, not every difference in witness testimony creates a triable issue of fact. Cunningham v. Hamilton, 84 Fed. App'x 357, 358 (4th Cir. 2004) (unpublished); see Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Accordingly, "[w]here ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Lee v. City of Richmond, 100 F. Supp. 3d 528, 534 (E.D. Va. 2015); see Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986).

Pursuant to 42 U.S.C. § 1983, Plaintiffs aver that Craighill and Howser deprived them of the right to be free from unjustified and excessive force by the police in violation of the Fourth and/or Fourteenth Amendment. Compl. ¶ 14. Additionally, Plaintiffs assert state law claims of gross negligence, assault and battery, and wrongful death. Id. ¶ 17. Defendants move for summary judgment on the grounds that they are entitled to qualified immunity for the federal claims and good faith immunity for the state claims. Doc. 27; Doc. 29. The Court will begin by addressing Craighill and Howser's qualified immunity defense.

### B. Qualified Immunity

Qualified immunity was established to "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Harlow v.

20

Fitzgerald, 472 U.S. 800, 815 (1982)). The Supreme Court in Saucier v. Katz, 533 U.S. 194, 200-01 (2001), laid out a mandatory two-step framework for resolving assertions of qualified immunity. The Saucier framework establishes that the court will first determine if the "facts that a plaintiff has . . . shown make out a violation of a constitutional right. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier, 533 U.S. at 201). Second, the Court will analyze "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Id. (citing Saucier, 533 U.S. at 201). The Court modified this analysis in Pearson v. Callahan, 555 U.S. 223, 232 (2009), by holding that the Saucier framework is optional but maintained that it is "often beneficial" to a court's analysis. Id. at 236. Therefore, Pearson and the follow-up cases hold that a court has discretion on which prong to address first. Hunsberger v. Wood, 570 F.3d 546, 552 (4th Cir. 2009) (citing Pearson, 555 U.S. 223). Since the Court finds that the use of force by Craighill and Howser did not violate the Plaintiffs' constitutional rights, it need not address the clearly established prong of the qualified immunity analysis. See Morse v. Frederick, 511 U.S. 393, 400 (2007); Grisson v. City of Fayetteville, 5:14-CV-272-BO, 2015 U.S. Dist. LEXIS 134775, at *14-15 (E.D.N.C. Oct. 2, 2015) (citing Greg v. Ham, 678 F.3d 333, 341 n. 7 (4th Cir. 2012) ("To prevail under qualified immunity, [defendant] has to show either that there was no constitutional violation or that the right violated was not clearly established.")).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The use of deadly force against an individual is a seizure subject to the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7 (1985). Therefore, the determination of whether the use of deadly force was "excessive" is analyzed under the Fourth Amendment's "objective reasonableness standard." Smith v. Ray, 781 F.3d 95, 100-01 (4th Cir. 2015). The intrusion on an

21

individual's Fourth Amendment right is "unmatched" when an officer employs deadly force. Swann v. City of Richmond, 498 F. Supp. 2d. 847, 854 (E.D. Va. 2007) (quoting Clem v. Corbeau 284 F.3d 543, 550 (4th Cir. 2002)).

Under the Fourth Amendment, an officer's actions are not considered excessive if they are "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Smith, 781 F.3d at 100-01 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). To determine the reasonableness of the force, the Court must "view it [the use of force] in full context, with an eye toward the proportionality of the force in light of all the circumstances." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994); see Garner, 471 U.S. at 11. Specifically, the Supreme Court in Graham v. Connor 490 U.S. 386, 397 (1989), articulated that courts should pay "careful attention to . . . the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Swann, 498 F. Supp. 2d. at 854 (quoting Graham, 490 U.S. at 396). Graham highlighted that reasonableness "must be judged from the perspective of the officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; see Swann, 498 F. Supp. 2d. at 854. Accordingly, the assessment of qualified immunity must filter the objective facts through the perspective of the officer at the time that force was employed. Rowland, 41 F.3d at 173. A court's inquiry will focus on what the officer "reasonably perceived" at the time of the incident. Id. The reasonable perception standard is based upon the fact "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. Moreover, when an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the

officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Garner, 471 U.S. at 11.

When assessing the reasonableness of force, the Fourth Circuit has provided guidance that "non-continuous uses of force during a single incident" should be assessed separately to determine if each use was constitutionally reasonable. Streater v. Wilson, 565 F. App'x 208, 211 (4th Cir. 2014) (unpublished). Following this guidance, the Court will begin its analysis with the first shots fired by Craighill and Howser and end with the second series of shots fired by Craighill.

### i. First Initial Shots Fired by Craighill and Howser

Starting with the initial shots, the Fourth Circuit has ruled on similar circumstances in the case of Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005). In Waterman, the Plaintiff drove up to a toll plaza and began coasting at around eleven miles per hour. Waterman, 393 F.3d at 474. The vehicle was "'lurching' or 'lunging' forward - and Waterman began to accelerate in the general direction of the toll plaza." Id. When the vehicle began accelerating, law enforcement officers were a variety of distances away from the vehicle ranging from 16 to 72 feet. Id. None of the officers were directly in the path of the vehicle but stood a few feet to either side of the path of the incoming vehicle. Id. at 474-75. The officers began firing their weapons as soon as the vehicle accelerated. Id. at 475. The officers continued to fire at the vehicle from behind as Waterman drove through the toll plaza. Id. The Fourth Circuit concluded that the officers were entitled to qualified immunity for the shots fired at the vehicle as it approached the toll plaza. Id. at 480. This conclusion is premised on the fact that the "suspect [was] well positioned to seriously injure or kill one or more of them with his vehicle - possibly within a fraction of a second - if they [the officers] did not employ deadly force." Id. at 481. However, with regard to the shots fired after the vehicle passed officers, the appellate court determined that "a reasonable factfinder could determine that any

23

belief that the officers continued at that point [the vehicle passed them] to face an imminent threat of serious physical harm would be unreasonable." Id. at 482.[2]

Here, after Craighill and Howser exited the Jeep, video evidence conclusively establishes that the Raptor began to quickly accelerate in the direction of Craighill. Plaintiffs' aver Craighill was far enough away from the Raptor that it was impossible to physically maneuver the vehicle to hit him. Doc. 35 at 16. Surveillance video confirms that, similar to the officers in Waterman, Craighill was not directly in the path of the accelerating Raptor. However, the video also shows that Craighill was in close enough proximity where one turn of the wheel could have resulted in serious injury. In Waterman, the Fourth Circuit's holding highlighted that the "closeness of the officers to the projected path of Waterman's vehicle is crucial to our conclusion that deadly force was justified." Id. at 479. Therefore, proximity is the determining factor and officers are not required to be directly in the path of an accelerating vehicle to reasonably perceive that serious harm may result. See id. at 479; see also Grisson, 2015 U.S. Dist. LEXIS 134775, at *5 (finding that a "vehicle driven directly at a law enforcement officer constitutes a deadly weapon.").

Craighill was faced with a split-second decision to determine whether deadly force was required in response to the oncoming vehicle. See Waterman, 393 F.3d at 478 (citing Graham, 490 U.S. at 396-97 (noting "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . .")). In this type of fast evolving situation, "the Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Id. at 480. Furthermore, Craighill is not required to be certain that the Raptor was going to hit him or that he was going to be shot. See Lee, 100 F. Supp. 3d at 542

---

[2] In Waterman, the Fourth Circuit held that officers were still entitled to qualified immunity for the subsequent shots because the right was not "clearly established in Maryland in November 2000." Waterman v. Batton, 393 F.3d 471, 483 (4th Cir. 2005).

("Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm."). The question is one of the officer's reasonable perception - not one of verified certainty.

Moreover, the facts indicate that the threat of serious harm was exacerbated by Craighill's perception that Bethea was brandishing a firearm from inside the car. The law certainly supports the proposition that "police do not have the unfettered authority to shoot any member of the public carrying a gun or other weapon." Pena v. Porter, 316 F. App'x 303, 311 (4th Cir. 2009) (unpublished). As a result, the Fourth Circuit has often required some sort of additional justification be present to provide officers with "probable cause to believe that the suspect pose[d] a threat of physical harm . . . ." Id. (quoting Garner, 471 U.S. at 11). Under these circumstances, there is sufficient grounds for probable cause that the occupants of the Raptor posed a threat of serious harm. Leading up to the approach on the Raptor, Craighill and Howser had confirmed that the Raptor was stolen. Therefore, both officers had probable cause that the occupants had committed a felony and were possibly involved in ongoing criminal activity. Howser Decl. at ¶ 18; Craighill Decl. at ¶ 9; see Va. Code § 18.2-95 (grand larceny is a felony in Virginia). This information was revealed to officers' as a result of a previous investigation that connected the Raptor to a surveilled stolen Buick Id. The stolen Buick was suspected to be involved in a variety of violent property crimes involving vehicle thefts, burglary, and vehicle tampering offenses. Id. Additionally, it was linked to a variety of gang activity and was being investigated for an exchange of gunfire that occurred at a Roses Discount Store earlier the same day. Howser Decl. at ¶¶ 7-8; Craighill Decl. at ¶ 5. From Craighill and Howser's perspective, both officers were equipped with suspicion that the Raptor was involved in similar violent activity because it was stolen and connected with the Buick. Howser Decl. ¶ 18; Craighill Decl. ¶ 9. The objective facts of the

25

investigation influenced Craighill and Howser's perspective that the occupants of the Raptor may be armed and dangerous.

Plaintiffs cling to the lack of Bethea's DNA on one of the recovered guns as proof that he never pointed a firearm at Craighill. This fact is unpersuasive in the Court's analysis. See Reese v. Anderson, 926 F.2d 494, 501 (5th Cir. 1991) (highlighting that it is irrelevant that an individual is unarmed if the officer has a reasonably belief that the individual had a weapon). The focus is on Craighill's perceptions and Plaintiffs fail to refute his perceptions of the incident with any convincing evidence. In conclusion, it was both the view of a firearm and the accelerating vehicle that fortified Craighill's decision to employ deadly force. His perception was equally emboldened by his own and Howser's previous investigation into the Raptor and the Buick. Therefore, the Court concludes that both the accelerating Raptor and the perception of a pointed firearm presented a threat of serious harm to Craighill. Accordingly, Craighill is entitled to qualified immunity for an objectively reasonable use of deadly force.

Howser is also entitled to qualified immunity for the shots fired at the Raptor. It is well established that "the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." Waterman, 393 F.3d at 481. At the time Howser fired, he had sound reason to believe that his fellow officer's safety was at risk. Howser witnessed the Raptor lurch forward and accelerate in Craighill's general direction. Additionally, Howser heard repetitive gunfire and perceived, although incorrectly, that the occupants of the vehicle were firing at either him or Craighill. Viewing these factual circumstances from Howser's perspective, it is objectively reasonable that he perceived an imminent threat of serious harm. See Grisson, 2015 U.S. Dist. LEXIS 134775, at *5 (finding that an officer's use of deadly force was reasonable where a vehicle accelerated at a fellow officer and there was the sound

of gunfire). Accordingly, Howser's use of force was justified. The Court finds that Howser is entitled to qualified immunity for his shots fired at the Raptor.

### i. Second Shots Fired by Craighill After Raptor Hit Gas Pump

Furthermore, Craighill is entitled to qualified immunity for the second series of shots fired after the Raptor crashed into the gas pump. After Craighill and Howser fired the initial shots into the Raptor, the vehicle accelerated past the officers and crashed into the 7-Eleven gas pumps. The Raptor at this moment was immobilized and as such a reasonable fact finder would conclude that the Raptor, as the vehicle in Waterman, no longer posed a threat of hitting Craighill. See Waterman, 393 F.3d at 481 ("force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."); see also Krein v. Price, 596 Fed. App'x 184, 189-90 (4th Cir. 2014) (unpublished). The evidence confirms that both Craighill and Howser thought the threat had mitigated and discontinued the firing of their weapons. As such, neither officer fully emptied their weapon into the Raptor. See Certificate of Analysis, Doc. 35-14. Furthermore, the video clearly shows Craighill lowering his pistol in between his initial round of shots and the Raptor striking the gas pump. Defs. 7-Eleven Video, Craighill Decl. Ex. 1 at 00:13; see Craighill Decl. at ¶ 13(g).

However, even though the threat of the Raptor had been eliminated, the situation here differs from Waterman because Craighill was faced a with newly developed threat of serious harm. Just after the crash into the pumps, the video shows the rear driver's side door of the Raptor violently fly open. It was at that moment, Craighill contends that Sawyer made aggressive eye contact with him and then attempted to raise a gun into a shooting position directed at Craighill. Craighill Decl. at ¶ 13(j); see Sawyer Dep. 85:21 – 86:2. At this moment, Craighill raised his weapon and fired into the back seat of the Raptor. Concerning the second shots, the question

27

presented is whether Craighill's use of force was objectively reasonable because he perceived an imminent threat of serious harm.

The Fourth Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action. Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001); see McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) (highlighting that an officer is entitled to use deadly force when the officer had reason to believe a suspect was armed, although the officer had not confirmed the information). Furthermore, in McLenagan, the court noted that under certain circumstances an officer is not always required to "see an object in the suspect's hand before using deadly force." McLenagan, 27 F.3d at 1007 ("We do not think it wise to require a police officer, in all instances, to actually detect the presence of an object in a suspect's hands before firing on him."); see also Anderson, 247 F.3d at 131. Therefore, "[a]n officer is not required 'to actually detect the presence of an object in a suspect's hands before firing on him,' if he or she otherwise has a reasonable belief that the suspect may be armed." Swann, 498 F. Supp. 2d. at 855 (emphasis added) (quoting McLenagan, 27 F.3d at 1007) (noting "the Constitution does not require that certitude precede the act of self protection."). The focus, similar to the first series of shots, is on whether Craighill had a reasonable belief that the Sawyer was armed and posed a serious threat.

Here, the Court finds that Craighill had a reasonable perception that Sawyer was armed. In the heat of the incident, Craighill saw a firearm and perceived that Sawyer was raising it directly at him. See Waterman, 393 F.3d at 481 (noting reasonableness is determined "based on the information possessed by the officer at the moment that force is employed."). Craighill is then faced with a difficult and fast-moving choice about whether to discharge his firearm. See Lee, 100 F. Supp. 3d at 541. Craighill is forced to choose between hesitation or discharging his weapon to

prevent a perceived threat to his own life. See id. The Fourth Circuit has made clear that "no court can expect any human being to remain passive in the face of an active threat on his or her life." Id. (quoting Elliot v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996). Any reasonable officer in the position of Craighill would have believed that there was an active threat on his life. Anderson, 247 F.3d at 131. As additional support, Craighill, at this moment in time, perceived that another occupant of the Raptor had just attempted to point a weapon at him and run him over. The foregoing incident provides Craighill with reasonable cause that the other individuals inside the vehicle may also be armed and dangerous. Plaintiffs aver that Bethea, like Sawyer, was shot after the vehicle crashed in the gas pumps. Plaintiffs support this assertion with the Kinnison autopsy noting that Bethea had two entry wounds into the back. Given the turmoil occurring at the scene, the way in which the bullets entered Bethea's back is unclear. Bethea's movements within the Raptor are unconfirmed and the evidence reflects that at some point shots did enter in through the rear passenger side window. Therefore, the Court finds no convincing evidence that Craighill fired shots at Bethea after the driver's door was opened.

Accordingly, Craighill equipped with preceding information and the perception that Sawyer was pointing a firearm in his direction, acted reasonably by employing deadly force. Craighill use of force did not violate the rights of the Plaintiffs and, therefore, he is entitled to qualified immunity for the second shots.

**C. State Law Claims**

Under Virginia law, Plaintiffs assert a variety of state law claims against Defendants. All Plaintiffs bring common law gross negligence claims against Craighill and Howser. Specifically, Clyburn and Sawyer bring a claim of common law assault and battery and the Estate of Bethea asserts a wrongful death claim pursuant to Virginia Code 8.01-50 et seq. "It has been well

29

established that the decision to exercise supplemental jurisdiction [over a state law claim] after a federal claim has been dismissed, rests within the sole discretion of the Court." Davis v. York Cnty. Bd. of Supervisors, No. 4:17cv39, 2017 U.S. Dist. LEXIS 213575, at *23 (E.D. Va. Sep. 7, 2017) (quoting Jones v. Tyson Foods, 378 F. Supp. 2d 705, 710 (E.D. Va. 2004)). Certain factors inform this discretionary decision such as "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995). These factors weight in favor of exercising jurisdiction over the state law claims. Here, the dismissed federal claims are closely connected to the state claims. Therefore, after the Courts review, all three factors weigh in favor of addressing the state law causes of action. See Hardin v. Belmont Textile Mach. Co., 355 Fed. App'x 717, 723 (4th Cir. 2009) (unpublished).

Courts have routinely determined that "a favorable ruling for the defendant on an excessive force claim brought under § 1983 requires dismissal of the state law claims as well." Russell ex rel. Russell v. Wright, 916 F. Supp. 2d 629, 645 (W.D. Va. 2013); see Sigman v. Town of Chapel Hill, 161 F.3d 782, 789 (4th Cir. 1998); Thompson v. City of Danville, No. 4:10cv00012, 2011 U.S. Dist. LEXIS 59698, *9 (W.D. Va. June 3, 2011); see also Rowland, 41 F.3d at 174 (noting parallel state law claim are "subsumed" within the excessive force claim). As a matter of law when an officer's actions are "reasonable in the circumstances of this case, they cannot be negligent or wrongful . . . ." Sigman, 161 F.3d at 789 (emphasis added). Therefore, the merit of the state law claims by Plaintiffs are tied directly to the reasonableness of the Craighill and Howser's actions. See Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013). This proposition further rests upon the Supreme Court of Virginia's ruling in DeChene v. Smallwood, which held that "an officer who in good faith believed that his actions were factually and legally sound . . .

30

[is] entitled to absolute 'good faith' immunity from a civil suit . . . ." DeChene v. Smallwood, 311 S.E.2d 749, 751-52 (Va. 1984). Therefore, an officer can "not be subjected to civil liability . . . when the officer acted in good faith and with probable cause." Harrison v. Deane, 426 F. App'x 175, 181 (4th Cir. 2011) (unpublished); see DeChene v. Smallwood, 311 S.E.2d 749, 751-52 (Va. 1984).

Addressing each claim individually, under Virginia law, gross negligence is defined as an "absence of slight diligence, or the want of even scant care." McLenagan, 27 F.3d at 1009 (quoting Frazier v. City of Norfolk, 362 S.E.2d 688, 691 (Va. 1987)). The Court has already determined that the actions taken by Craighill and Howser are objectively reasonable under the circumstances. Accordingly, the gross negligence claim has no merit because Defendants did not act in the absence of diligence or care. Summary judgment is also appropriate on Plaintiffs' claims of assault and battery and wrongful death. To succeed on a claim of assault and battery, Clyburn and Sawyer are required to prove a "wrongful act". McLenagan, 27 F.3d at 1009 (quoting Pike v. Eubank, 90 S.E.2d 821, 827 (Va. 1956)). Wrongfulness carries with it an implication that there is a "lack of justification or excuse." Id. (citing Pike v. Eubank, 90 S.E.2d 821, 827 (Va. 1956)). Moreover, Bethea's wrongful death claim fails because § 8.01-50 requires "negligent, intentional, or reckless conduct." Waller v. City of Danville, No. 4:03CV00039, 2005 U.S. Dist. LEXIS 34584, at *22 (W.D. Va. Dec. 12, 2005), rev'd on other grounds, 212 Fed. App'x 162 (4th Cir. 2006) (unpublished). Craighill and Howser's use of force has already been found to be justified under the circumstances and, therefore, their actions as a matter of law, cannot be wrongful or negligent. As a result, Plaintiffs cannot prove gross negligence, assault and battery, or wrongful death. Therefore, the Court finds that summary judgment is appropriate as to all of the Plaintiffs' state law claims in favor of Craighill and Howser.

## III. CONCLUSION

For the reasons herein, Craighill and Howser's Motions for Summary Judgment are **GRANTED**. The Clerk is **REQUESTED** to electronically deliver a copy of this Opinion & Order to all counsel of record.

It is **SO ORDERED**.

/s/

Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

March 20, 2020
Norfolk, Virginia